UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>AMBER R. CROWDER,<br>    also known as "AMBER HINES,"<br><br>and<br><br>SHAUNA MARIE BRUMFIELD,<br>    also known as "MARIE MATTHEWS,"<br>    also known as "SHAUNA SNELL,"<br><br>Defendants. | Criminal No. 17-186 (JDB) |

## MEMORANDUM OPINION

Before the Court is [25] the government's motion to disqualify defendant Amber Crowder's counsel, Gregory Lattimer. The government claims that Lattimer must be disqualified because of a "web of representations" he has allegedly spun, serving as an attorney not only for Crowder but also for defendants' companies—A Simple Solution, LLC and Education Connection, LLC—and, at one time, for Crowder's co-defendant, Shauna Brumfield. Gov't's Mot. to Disqualify Gregory Lattimer as Counsel for Amber Crowder ("Gov't's Mot.") [ECF No. 25] at 11–12, 14–16, 21. These varied representations, the government says, create conflicts of interest to which the clients have not consented and that render Lattimer unable to represent Crowder in this case. Id. at 10–19, 21. The government also asserts that it wishes to subpoena Lattimer as a trial witness, which could likewise prohibit him from serving as Crowder's attorney. See id. at 19–20. However, based upon the existing record and Lattimer's uncontested statements at the motions hearing held on this matter, the Court finds that Lattimer never enjoyed an attorney-client relationship with either Brumfield or defendants' companies that would form the basis for a

1

disqualifying conflict. The Court also finds that Lattimer will not be a necessary witness, and therefore can remain an advocate. Hence, for the reasons explained below, the Court will deny the government's motion.

## I. BACKGROUND

Crowder and Brumfield are currently awaiting trial on charges related to an alleged scheme to defraud the District of Columbia Public Schools (DCPS). The investigation in this case began in February 2013, when the D.C. Office of Inspector General (OIG) issued an administrative subpoena to Education Connection, requesting documents relating to a person whom defendants claimed was an employee of that company. See Subpoena Duces Tecum & Decl. of Custodian of Records, Ex. A to Gov't's Mot. [ECF No. 25-1]. Brumfield responded to the subpoena as the "owner" of Education Connection. Id. There was no indication that Lattimer played any role in Brumfield's response. See id.; see also Gov't's Mot. at 2.

On April 1, 2016, the government served grand jury subpoenas on Brumfield, in her capacity as registered agent for Education Connection and A Simple Solution, seeking records from those companies. See Education Connection Subpoena, Ex. A to Notice of Potential Conflict of Interest [ECF No. 16-1]; A Simple Solution Subpoena, Ex. B to Notice of Potential Conflict of Interest [ECF No. 16-2]. On April 18, 2016, Lattimer emailed the government, stating that he had "been advised that [the government] sent a subpoena to Simple Solution, LLC care of Shauna Brumfield, its purported registered agent." See Email from Gregory Lattimer to Anthony Saler, Ass't U.S. Att'y (Apr. 18, 2016, 9:06 AM) ("April 2016 Email"), Ex. B to Gov't's Mot. [ECF No. 25-2]. He did not say by whom he had been so advised. He claimed, however, that A Simple Solution "is defunct," and that therefore the subpoena to the company "is in error." Id. "Nonetheless," he continued, "I have instructed Ms. Crowder and Ms. Brumfield to gather any

documents that either may have that is [sic] responsive to the subpoena and to provide them to me." Id. Lattimer expressed confidence that the government would therefore withdraw the subpoena, which would "obviate the need for [him] to seek court protection, as [he sought] to accommodate" the government's request. Id. On April 23, Lattimer provided the government what he said were all of the responsive records of both Education Connection and A Simple Solution "that ha[d] been located." Email from Gregory Lattimer to Anthony Saler, Ass't U.S. Att'y (Apr. 23, 2016, 5:44 PM), Ex. C to Gov't's Mot. [ECF No. 25-3]. He repeated that "neither company remain[ed] in business," and that, therefore, the government's "subpoena to Ms. Brumfeld [sic] was unenforceable"; but he said that, "out of a spirit of cooperation, I am producing what we have in a further attempt to convince the government of our good-faith." Id.

In July 2017, believing that the earlier response to the grand jury subpoenas was incomplete, the government contacted Lattimer and requested "a number of documents missing from the response." Email exchange between Anthony Saler, Ass't U.S. Att'y, and Gregory Lattimer ("July/Aug. 2017 Emails"), Ex. E to Gov't's Mot. [ECF No. 25-5] at 3.[1] In responding to this inquiry, Lattimer consistently referred to "my client"—in the singular—and told the government that "she provided what she had in her possession" but that some documents were stored on her DCPS account, to which she no longer had access. Id. at 2. The government responded by expressing its view that Lattimer's "client is Education Connection which was run from Shauna Brumfield's house." Id. at 1. This view stemmed from an email exchange in May 2017, see Gov't's Mot. at 3, in which the government asked Lattimer if he was representing a number of people and entities, including Crowder, A Simple Solution, and Education Connection,

---

[1] Lattimer attached an unredacted copy of this email exchange as an exhibit to his opposition brief. See Ex. 1 to Def. Amber Crowder's Mem. of P. & A. in Opp'n to the Gov't's Mot. to Disqualify Her Counsel ("Def.'s Opp'n") [ECF No. 35-1].

3

see Email exchange between Anthony Saler, Ass't U.S. Att'y, and Gregory Lattimer ("May 2017 Emails"), Ex. D to Gov't's Mot. [ECF No. 25-4] at 1. At that time, Lattimer stated: "I do represent the individuals and companies that you have identified. However, Education Connections [sic] and A Simple Solution are no longer in business." Id. In the July email exchange, however, Lattimer did not directly respond to the government's assertion that Education Connection was his client. Instead, he stated that he "had [his] client search again for the records that [the government was] seeking," but that "[s]he never had physical possession of the records of Education Connection which as you acknowledge, was run out of the house of Ms. Brumfield." July/Aug. 2017 Emails at 1.

On February 7, 2018, the government filed a notice with the Court stating that it believed Lattimer had a potential conflict of interest. See Notice of Potential Conflict of Interest [ECF No. 16] at 3. In the weeks after this filing, the government contacted Lattimer (and Brumfield's counsel) in hopes of agreeing on a stipulation regarding the authenticity of the documents received in response to the grand jury subpoenas. See Email exchange between Gregory Lattimer and Anthony Saler, Ass't U.S. Att'y, Ex. 3 to Def.'s Opp'n [ECF No. 35-3] at 1.[2] The government believed its proposed stipulation would address its concerns about Lattimer's alleged past representation of defendants' companies. Id. The parties could not agree on a stipulation—not because of a factual dispute over the records' authenticity, but rather because of a legal dispute over whether the subpoenas were enforceable against the companies given Lattimer's understanding that they no longer existed when the subpoenas were issued. See id.; Email exchange between Gregory Lattimer and Anthony Saler, Ass't U.S. Att'y ("Feb. 2018 Emails"),

---

[2] The government provided redacted versions of this email exchange in exhibits to its disqualification motion. See Exs. F & H to Gov't's Mot. [ECF Nos. 25-6, 25-8]. Since Lattimer provided the full emails in a public filing, and since the government has not requested that the documents be sealed, the Court will rely on the full versions of the emails, noting that the unredacted portions of the government's exhibit match Lattimer's.

4

Ex. 2 to Def.'s Opp'n [ECF No. 35-2] at 2; see also Def.'s Opp'n at 13 ("There is no dispute about the authenticity of Education Connection or A Simple Connection documents as evidenced by the stipulation proposed by defendant Crowder . . . .").

During this back-and-forth, Lattimer stated that in 2016 he had "reached out to Ms. Brunfield [sic] and Ms. Crowder to see if they had any documents that you might have been seeking." See Feb. 2018 Emails at 2. This comment prompted the government to ask in what capacity—as whose counsel—Lattimer believed he was acting when he provided the responsive documents. See id. Lattimer responded by telling the government: "I had represented A Simple Solution and Education Connection when they were viable entities. At the time that you forwarded the subpoena I represented Ms. Crowder." Id. at 1. Lattimer continued to assert that the companies did not exist when the subpoenas were issued. See id.[3]

Soon after this exchange, on March 2, 2018, the government filed a motion to disqualify Lattimer as Crowder's counsel in this case. See Gov't's Mot. at 1. After full briefing, the Court held a motions hearing. At the hearing, Lattimer made a number of factual statements regarding his relationships with the companies and with Brumfield. First, he stated that the sum total of his representation of the companies was to make one or two phone calls to regulatory authorities, asking how to respond to an inquiry or how to file documents. See Tr. of Mot. Hr'g [ECF No. 54] at 37:1–:12. While Lattimer told the authorities that he was calling on behalf of one of the companies, he never filed anything on the companies' behalf, never had a retainer agreement, and never received remuneration. Id. at 37:13–:21; see Lattimer Aff., Ex. 4 to Def.'s Opp'n [ECF No. 35-4] ¶¶ 3–4. His last act on the companies' behalf occurred in 2011 or 2012; he therefore had no

---

[3] Education Connection was administratively dissolved in 2012, and A Simple Solution was likewise dissolved in 2015. See Certificate, Ex. G to Gov't's Mot. [ECF No. 25-7]. But an administrative dissolution keeps a company alive for certain purposes. See D.C. Code §§ 29-106.02, -807.02.

5

involvement with the companies by the time of the OIG subpoena in 2013. Tr. of Mot. Hr'g at 37:22–:23, 38:17–39:19. He had no knowledge of the companies' business operations or any other confidential information except through his representation of Crowder in this case. See Lattimer Aff. ¶ 4; Tr. of Mot. Hr'g at 38:7–:16, 46:6–:14. To the extent he had any conversations regarding the companies, he stated that they would have been with Crowder rather than with Brumfield or anyone else. Tr. of Mot. Hr'g at 39:20–40:5.

As for Brumfield, Lattimer stated that he has never had a conversation with her outside the presence of her attorneys, and that he never represented her. Id. at 42:2–:3, 42:10–:12; Lattimer Aff. ¶ 1. He clarified that he found out about the subpoenas through Crowder, and did not recall having discussed the grand jury subpoenas with Brumfield's counsel. Tr. of Mot. Hr'g at 36:1–:9, 42:13–:17. Finally, Lattimer said that he had responded to the subpoena not as a representative of the companies, but rather because he was worried that the government's statement that "your client is Education Connection" meant that the government believed Crowder to be an alter ego of the companies. Id. at 34:19–35:13, 36:12–:17, 42:19–:22. He therefore sought to provide any available documents to placate the government, and asked Crowder to find any that were available. Id. at 35:19–:22. Lattimer did not speak directly to Brumfield regarding the subpoenas, but does not know whether intermediaries—presumably Crowder—may have, and thereby indirectly conveyed information. Id. at 41:21–42:7. The government acknowledged that it had no basis to dispute any of Lattimer's factual representations. Id. at 46:18–55:7.

## II.  LEGAL STANDARD

A district court may disqualify an attorney from appearing in a case before it "if there is a conflict of interest or if the attorney has committed ethical violations." Konarski v. Donovan, 763 F. Supp. 2d 128, 135 (D.D.C. 2011). However, "[d]isqualification of counsel is uncommon, as

evidenced by the relative paucity of case law directly on point." Paul v. Judicial Watch, Inc., 571 F. Supp. 2d 17, 20 (D.D.C. 2008). Indeed, disqualification is highly disfavored, and any motion to disqualify counsel is therefore examined with a skeptical eye. See Konarski, 763 F. Supp. 2d at 135–36; see also Koller ex rel. Koller v. Richardson-Merrell Inc., 737 F.2d 1038, 1056 (D.C. Cir. 1984), vacated on other grounds, 472 U.S. 424 (1985) ("[U]nless an attorney's conduct tends to 'taint the underlying trial,' . . . courts should be quite hesitant to disqualify an attorney." (citation omitted)). Before granting a motion to disqualify, a court must consider "first, whether a violation of an applicable Rule of Professional Conduct has occurred or is occurring, and if so, whether such violation provides sufficient grounds for disqualification." Headfirst Baseball LLC v. Elwood, 999 F. Supp. 2d 199, 204 (D.D.C. 2013) (citation omitted). In making these determinations, courts in this district follow the District of Columbia Rules of Professional Conduct. See LCrR 57.26(a).

In a criminal case, constitutional considerations also come into play. The Sixth Amendment guarantees criminal defendants the right to counsel of their choice. See U.S. Const. amend. VI; Wheat v. United States, 486 U.S. 153, 158–59 (1988). However, this right to counsel "includes a 'correlative right to representation that is free from conflicts of interest.'" United States v. Lopesierra-Gutierrez, 708 F.3d 193, 199 (D.C. Cir. 2013) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)). Unfortunately, these two Sixth Amendment rights work at cross-purposes when a defendant's chosen counsel has an identified conflict of interest. See id. Moreover, "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160. Hence, if a court identifies a conflict, it must balance these Sixth Amendment and judicial interests when deciding whether disqualification is proper. See Lopesierra-Gutierrez, 708 F.3d at 200. "The outcome of that balance turns on the nature and extent of the conflict." Id.

## III.     DISCUSSION

The government's claims implicate three rules of professional conduct, spread over three potential conflicts. The Court will examine each alleged conflict in turn.

### A.  ALLEGED REPRESENTATION OF THE COMPANIES

The government's first—and most plausible—claim is that Lattimer represented A Simple Solution and Education Connection, and that these representations create a conflict with Lattimer's role as Crowder's attorney. Crowder, as an admitted co-owner of both companies, see Crowder Statement [ECF No. 17-2] at 2, could only share an attorney with the companies "subject to the provisions" governing conflicts of interest. D.C. R. Prof'l Conduct 1.13(d). The government stated in its briefing that it did not know whether Lattimer represented the companies at the time the grand jury subpoenas were issued or still represents them today. See Gov't's Mot. at 12. If Lattimer were representing both Crowder and the companies at the same time, Rule 1.7 would apply. This rule prohibits representation of a client if that "representation will be or is likely to be adversely affected by representation of another client." D.C. R. Prof'l Conduct 1.7(b)(2). On the other hand, if his representation of the companies ended before he began representing Crowder, then Rule 1.9's standards regarding conflicts between current and former clients would govern.

It is understandable that the government might believe that Lattimer was still representing the companies at least as of the time of the grand jury subpoenas. After all, he responded to a government inquiry in May 2017 regarding his representation of A Simple Solution and Education Connection by stating, in the present tense: "I do represent the . . . companies that you have identified." May 2017 Emails at 1. But Lattimer has since progressively clarified both the timeframe and the scope of his representation of the companies. In February 2018, he told the government that he had only represented the companies for some undefined period "when they

8

were viable entities," and not at the time of the subpoenas, when he only represented Crowder. Feb. 2018 Emails at 1. In responding to the government's motion to disqualify him, Lattimer narrowed down the timeline further, stating that he "may have addressed some issues regarding regulatory compliance or made some inquiries of [the D.C. Department of Consumer and Regulatory Affairs] on behalf of" the companies "[i]n 2011 or 2012," or perhaps into 2013. Lattimer Aff. ¶ 2. Finally, at the motions hearing, Lattimer made representations along the same lines as those in his response to the government's motion: he had made one or two calls to regulatory authorities, using the companies' names, prior to the 2013 OIG subpoena, and had engaged in no other work for the companies then or subsequently. See Tr. of Mot. Hr'g at 37:1–39:19. It is regrettable that Lattimer used imprecise or perhaps even inaccurate descriptors of his relationship with the companies in his earlier correspondence with the government. But the government did not dispute Lattimer's statements regarding the quite limited scope and timeframe of his representation. See id. at 49:2–50:13. The Court therefore finds that Lattimer did not represent the companies at the time he began representing Crowder in this matter.

The Court will assume for the purposes of resolving this motion that Lattimer had a true attorney-client relationship with the companies, prior to his representation of Crowder, based solely on these phone calls. But see Lattimer Aff. ¶¶ 2–3 (stating that Lattimer's services were "limited in scope," "pro bono," provided without any retainer agreement, and involved no written correspondence with the companies). As the companies were former clients when Lattimer began to represent Crowder, Rule 1.9 governs. That rule provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." D.C. R. Prof'l Conduct 1.9.

9

Based upon the existing record, the Court determines that the government has not shown that this criminal case is "the same or a substantially related matter" as the phone calls Lattimer made on the companies' behalf in 2011 and 2012.

Under Rule 1.9, matters are substantially related "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." D.C. R. Prof'l Conduct 1.9, cmt. 3. At the motions hearing, the government took a broad view of Rule 1.9. This case, the government asserts, revolves around the allegation that the companies' entire existence was designed to perpetrate a fraud; ergo, <u>any</u> representation of the companies was in a matter substantially related to this one. See Tr. of Mot. Hr'g at 15:8–:21. This argument might have carried some weight had Lattimer's prior representation given him the potential to access information that would be relevant to this case. However, Lattimer has made uncontested submissions to the Court that his representation was limited to a couple of phone calls regarding regulatory filing procedures, that he learned nothing about the companies' operations and never filed anything on their behalf, and that he was privy to no information regarding the "matters that lie at the heart of this case." See id. at 37:1–38:16, 46:6–:14. "In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation," D.C. R. Prof'l Conduct 1.9, cmt. 3, and it does not do so here.

Even if the Court were to ignore Lattimer's statements regarding the information to which he actually had access, as D.C. law suggests courts do, see <u>Brown v. D.C. Bd. of Zoning Adjustment</u>, 486 A.2d 37, 50 (D.C. 1984), the scope of his representation—isolated phone calls seeking limited information about the District's regulatory processes—was so narrow and so far

10

from this case that it is not "reasonable to infer counsel may have received information during the first representation that might be useful to the second," Paul, 571 F. Supp. 2d at 25 (quoting Brown, 486 A.2d at 50).[4] This fact is sufficient to dispose of the government's broad argument. It also belies the narrower assertions of a conflict the government laid out in its briefs—all of which are premised on the understandable but ultimately mistaken belief that Lattimer may still have represented the companies while he was representing Crowder in the pre-indictment phase of this case, and that he therefore may have had far more information about the companies than it turns out he does. See Gov't's Mot. at 13–14, 16; Reply [ECF No. 43-1] at 1–3, 11. Since Lattimer did not represent the companies in the same or a substantially related matter, there is no Rule 1.9 violation—and hence no reason to disqualify Lattimer—based on that prior representation.

## B. ALLEGED REPRESENTATION OF BRUMFIELD

The government next claims that Lattimer may have acted as Brumfield's attorney while responding to the grand jury subpoenas. There is no indication that Lattimer still represents Brumfield. Indeed, she was then represented by an attorney and is now represented by a different one. The government therefore invokes Rule 1.9 to claim that Lattimer has a conflict between the interests of a former and a current client.[5] See Gov't's Mot. at 16–17. Representing one co-defendant and then another in the same criminal action undoubtedly raises a serious potential for

---

[4] District of Columbia law does hold that, "[o]nce a 'substantial relationship' between the prior representation and the present matter is shown[,] . . . [there is] an irrebuttable presumption that the attorney has information that can be used for the benefit of the present client to the detriment of the former." Paul, 571 F. Supp. 2d at 26. Yet one must first answer the substantial relationship question in the positive before making this presumption; and, for the reasons explained above, it cannot be said that Lattimer's isolated phone calls seeking limited information about the District's regulatory processes were substantially related to this criminal matter.

[5] Some courts in this district have stated that "[t]he nature of the attorney-client relationship at the time the conflict arose governs the applicable standard, regardless of the status of that relationship at the time of the disqualification motion." Headfirst Baseball, 999 F. Supp. 2d at 206 (citation omitted). As Crowder was Lattimer's current client at the time he allegedly began to represent Brumfield, Rule 1.7 would apply under this standard. However, for the reasons explained here, it is not necessary for the Court to determine which timeframe is correct.

disqualifying conflicts of interest, because of the attorney's dual duties of loyalty and likely possession of confidential information. See, e.g., United States v. Bikundi, 80 F. Supp. 3d 9, 17 (D.D.C. 2015). There is no such conflict here, however, because Lattimer and Brumfield never had an attorney-client relationship.

"An attorney-client relationship is formed when a client and an attorney 'explicitly or by their conduct, manifest an intention to create the attorney/client relationship.'" Headfirst Baseball, 999 F. Supp. 2d at 209 (quoting In re Ryan, 670 A.2d 375, 379 (D.C. 1996)). An attorney may either explicitly manifest such an intention or else engage in conduct such that the lawyer "knows or reasonably should know that the person [seeking services] reasonably relies on the lawyer to provide the services." Restatement (Third) of the Law Governing Lawyers § 14(1) (2000). To determine whether an attorney-client relationship exists, courts look to a number of factors, among them (1) "the character or nature of the information allegedly shared with the attorney"; (2) "the payment of fees"; and (3) "the existence of a formal agreement"—though neither of the latter two is necessary to establish a relationship. Headfirst Baseball, 999 F. Supp. 2d at 209.

Here, the government does not allege that Lattimer and Brumfield ever explicitly expressed a desire to form an attorney-client relationship, that Brumfield paid Lattimer, or that they signed a formal agreement. The sum total of the government's evidence consists of Lattimer's statements to the government in emails that he "reached out to" or "instructed" Brumfield to provide documents, and his implied threat to take court action to prevent the government from enforcing the subpoenas. But Lattimer has since clarified that he never represented Brumfield (indeed, has never had a one-on-one conversation with her), that he had found out about the subpoenas from Crowder, and that he was interacting with the government in his role as Crowder's attorney because of his concern that the government viewed Crowder as the companies' alter ego. See Tr.

of Mot. Hr'g at 34:19–35:13, 36:1–:17, 42:2–:22. Brumfield, for her part, has not indicated that she had ever intended for Lattimer to provide her with legal services. The government has not challenged these factual statements. See Tr. of Mot. Hr'g at 47:14–:17, 48:7–:16. The Court therefore finds no attorney-client relationship between Lattimer and Brumfield—and hence no conflict under Rule 1.9.

### C. POTENTIAL FOR BEING CALLED AS A WITNESS

Finally, the government states that it has asked the Department of Justice (DOJ) for permission to issue a trial subpoena that would require Lattimer to testify in this case. If Lattimer were in fact called to testify, it is possible that he would run afoul of Rule 3.7, which provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness," except in certain enumerated circumstances. D.C. R. Prof'l Conduct 3.7(a).

It is difficult to see how it is likely that Lattimer will be a necessary witness in this case. In its briefing, the government suggested that it might have to force Lattimer to testify if either defendant contests the authenticity or completeness of the records provided in response to the grand jury subpoenas, or if the subpoena responses become a contested issue at trial, because Lattimer is the only person other than defendants who had a role in responding to the subpoenas. See Notice of Potential Conflict at 4–5. The government also suggested that, if these issues become contested during the trial, Lattimer has the potential to act as an unsworn witness by "subtly impart[ing] to the jury his first-hand knowledge of the events" without the safeguards of the adversarial process. Id. at 5–6 (quoting United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993)). However, during the motions hearing the government shifted position, now asserting that it wants Lattimer to testify about who first approached him over six years ago and asked him to represent the companies, and what he was asked to do in representing the companies. See Tr. of

Mot. Hr'g at 27:8–29:2. As to this latter set of questions, Lattimer has already made uncontested statements regarding the scope of his representation of the companies. The government has given no reason why it would be necessary to put Lattimer on the stand and question him further.

With regard to the grand jury subpoenas, any need for Lattimer to testify is too remote a possibility to be "likely" under Rule 3.7. First, the government must be successful in its application to DOJ for permission to issue a trial subpoena. But the government has admitted that DOJ will not make a determination on the request until the Court decides whether to disqualify Lattimer, because one consideration DOJ takes into account when deciding whether to subpoena an attorney is whether he is representing a defendant in the case in which he would be called to testify. See Tr. of Mot. Hr'g at 29:16–30:24. Thus, the Court must decide whether to disqualify Lattimer, which depends in large part on whether DOJ would allow a trial subpoena to be issued; but DOJ will not move without an answer from the Court on whether to disqualify Lattimer. This is a paradox worthy of Heller. See Joseph Heller, Catch-22 (1961).

Even if DOJ issued a trial subpoena, however, there is nothing in the record to indicate that the matter of the grand jury subpoenas is likely to become a contested issue at trial such that Lattimer's testimony—beyond the representations he has already provided—would be necessary (or able) to resolve it. The government suggests that not being able to question Lattimer regarding his reaction to the subpoenas makes it more difficult for the government to prove at trial that a diligent search was performed in response to those subpoenas. See Tr. of Mot. Hr'g at 24:18–26:10. As the previous attempts at agreeing to a stipulation indicate, however, it is far from clear that this will remain a contested issue by the time of trial. And if it does, that does not give the government the right to place the defense attorney on the stand to explain how he worked with his client to respond to a document request. It is hazardous as a general matter to allow the government

to subpoena a defense attorney to testify against his own client, thereby forcing attorney and client to sever their relationship. Though there is no sign of ill intent in this case, the Court must remain mindful that "disqualification motions may be used as 'procedural weapons' to advance purely tactical purposes." Paul, 571 F. Supp. 2d at 20 (citation omitted). The government must therefore show, with evidence that it has not thus far provided, that Lattimer's testimony is likely to be needed. And as trial draws nearer, the Court will have ever-greater reason to heed Rule 3.7's admonition that disqualification is not required when it "would work substantial hardship on the client." D.C. R. Prof'l Conduct 3.7(a)(3). Hence, Rule 3.7 does not require disqualification here.[6]

## IV. CONCLUSION

The Court appreciates that the government has an obligation to bring to the Court's attention a defense attorney's potential conflict of interest. However, based on the current record, the Court finds that there is no basis to disqualify Lattimer as Crowder's counsel. The government's motion will therefore be denied.

/s/
JOHN D. BATES
United States District Judge

Dated: May 25, 2018

---

[6] The government also asserts that "Mr. Lattimer has a personal interest in vindicating his actions while representing the two companies, Defendant Crowder, Defendant Brumfield (in response to the grand jury subpoenas), Person B [Crowder's husband], and the two companies owned by Person B," and that "this interest may reasonably affect his representation of Defendant Crowder" under Rule 1.7(b)(4). Gov't's Mot. at 18. Rule 1.7 prohibits representation without informed consent if "[t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests." D.C. R. Prof'l Conduct 1.7(b)(4). The government has not identified any such responsibility or interest outside of Lattimer's representation of Crowder in this litigation, except that he has known Crowder and Person B for many years and had previously represented Person B's companies in unrelated matters. See Gov't's Mot. at 17–18. But the government does not explain, nor does the Court see, how those facts would adversely affect Lattimer's professional judgment in this case. The government also points to Lattimer's actions in responding to the grand jury subpoenas, see id. at 17, but again does not explain how this would affect Lattimer's professional judgment now, other than to suggest that he "has a personal interest in vindicating his actions," id. at 18. But every attorney has a personal interest in vindicating her own tactical decisions from earlier phases of the same matter; if a party could disqualify an opposing attorney any time the party questioned an investigatory or discovery-related action by that attorney, litigants would be hard-pressed to maintain counsel. The Court does not find any personal or other interest of Lattimer's sufficient to merit disqualification under Rule 1.7(b)(4).

15